712 So.2d 8 (1998)
STATE of Louisiana
v.
Allen ROBERTSON, Jr.
No. 97-KA-0177.
Supreme Court of Louisiana.
March 4, 1998.
Rehearing Denied April 3, 1998.
*14 Nicholas J. Trenticosta, New Orleans, Paula M. Montonye, New Haven, CT, for Applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moreau, District Attorney, Premila Burns, Richard C. Nevils, Baton Rouge, for Respondent.
KIMBALL, Justice.[*]
Allen Robertson, Jr. was indicted by a grand jury for the first degree murders of Morris and Kazuko Prestenback in violation of La. R.S. 14:30. After a trial, the jury found defendant guilty as charged and recommended a sentence of death. The trial court sentenced defendant to death in accordance with the jury's recommendation. In this direct appeal from that conviction and sentence,[1] defendant raises 37 assignments of error, both argued and unargued, which he alleges implicate the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 3, 5, 9, 12, 13, 15-17, 19, 20, and 22-24 of the Louisiana Constitution. Finding no reversible error in any of the assignments, we affirm both the conviction and the sentence.

FACTS
On January 1, 1991, at some time after 10:00 p.m., defendant left a nightclub with the intention of stealing something which he could sell for money to buy drugs. He entered the home of Morris and Kazuko Prestenback, an elderly couple whom defendant knew lived a few houses down from defendant's mother's house on Dalton Street in Baton Rouge. Defendant entered the back of the house through a screen door which the Prestenbacks had left open for the convenience of their pet cats. Defendant searched the darkened house and observed the Prestenbacks asleep in separate bedrooms. He proceeded to the living room, where he removed a vase and a framed photograph from atop a color television set, and then left the house with the set, selling it down the street for $20.00.
A very short time later, defendant returned. This time, however, he paused to take a 13" butcher knife from the kitchen before heading to the bedroom of 76-year-old Morris Prestenback. Defendant then proceeded to hit, cut, slash and stab Mr. Prestenback on the top of his head, and in his eye, face, throat and chest. In a prolonged struggle on the bed and floor of the bedroom, the victim suffered numerous fractures of the facial and nasal bones, and multiple stab wounds to the head, face and chest. Some of the eight stab wounds to the chest hit vital organs and major blood vessels, severed eight of the victim's ribs, and were almost 7" deep. Blood was spattered over the bed, headboard, ceiling and walls. The victim bled to death.
While defendant was brutally murdering her husband, 71-year-old Kazuko Prestenback awoke, left her bedroom, came upon the carnage, and attempted to flee. Defendant turned and stabbed the 5-foot, 90-pound woman in the back. Mrs. Prestenback then returned to her bed where defendant stabbed her multiple times in the chest. As with her husband, several of Mrs. Prestenback's ribs were severed completely through, and the *15 savagery of the attack splattered blood on the ceiling and walls of her room. She also bled to death and was found in a fetal position in her bed.
After remaining in the house for some time to insure the victims were dead, defendant took Morris Prestenback's watch, car keys, and wallet containing $260.00 from a shelf in the headboard of his bed and left the house. Once outside, he got in the Prestenbacks' gray Oldsmobile Cutlass and backed out of the driveway, uprooting and driving over a chain link fence and gate which had blocked his way. An off-duty police officer in a marked unit saw the Oldsmobile run a stop sign a half block from the victims' home around 10:30 p.m. The officer followed the car, and when the car sped up and made an illegal turn, the officer turned on his lights and siren. After making the turn, the officer observed the Oldsmobile abandoned in a yard. On the front seat of the car was the butcher knife, covered with blood and dirt. When fleeing the scene, defendant also tore the lining of his shoe on a fence, leaving fibers caught on the fence. Defendant ultimately made his way to the home of his girlfriend, Michelle Alexander.
Over the course of the night and next day, defendant confessed the crime to various family members. Authorities received anonymous tips implicating defendant in the murders. In the very early morning of January 3, defendant was arrested at Alexander's home and taken to the police station where he gave a series of taped statements to investigators.
Defendant was indicted on two counts of first degree murder. After a trial in 1991, defendant was found guilty as charged and sentenced to death on both counts. On direct appeal to this court, the conviction was reversed because the trial judge erred in failing to sustain a particular challenge for cause by defendant. State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278. A second trial was held in May of 1995, and defendant was again found guilty as charged on each count of first degree murder.[2] The jury also unanimously recommended imposition of the death penalty, finding three statutory aggravating circumstances applicable to each crime: that the murder occurred during commission of an aggravated burglary, that the murder occurred during commission of an armed robbery, and that the offender knowingly created a risk of death to more than one person. With respect to the murder of Morris Prestenback, the jury found the additional aggravating circumstance that it had been committed in an especially heinous, atrocious or cruel manner. La.C.Cr.P. art. 905.4.
Defendant assigns 37 assignments of error, six of which are unargued. The unargued assignments of error do not present reversible error and are governed by clearly established principles of law. They will be reviewed in an unpublished appendix which will comprise part of the record in this case.

LAW AND DISCUSSION

VOIR DIRE

Gubernatorial Commutation and Pardon Powers/Assignment of Error 1
Defendant argues the trial court committed reversible error when it advised various jury panels during voir dire on the commutation and pardon powers of the governor. The record reveals the trial judge referred to the governor's commutation and pardon powers during voir dire of various sub-panels on seven occasions. First, in response to a question by a potential juror as to the certainty that a defendant sentenced to life in prison would actually remain in prison for that length of time, the trial judge responded:
Judge: Yes, ma'am. I'm glad you asked that question. I usually remember to tell you all and I forgot. In Louisiana, when a person is sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence, that's basically what it means. No probation, *16 no parole, the sentence can't be suspended. You don't get good time, if you've ever heard of that. You do life imprisonment unless the governor were to pardon you or commute your sentence. I don't know how often that happens. I can't give you numbers, but in my life time, since I've been doing this, I don't remember it happening very often, if at all in a first degree murder case. So, yes, in effect, if somebody is sentenced to life imprisonment in Louisiana, it's not like a lot of states where life means that you are eligible for parole after a certain number of years and that kind of thing. It's not like that. Basically, you would probably die in prison.
Jurors Rauschkolb and Robin were the only members of the panel which heard this comment who were ultimately seated.
The second comment came as the judge was instructing a sub-panel:
Judge: Now, life imprisonment without benefit of probation, parole, or suspension of sentence, basically, means that in Louisiana. A lot of states, a lot of places you read where you see somebody is sentenced to twenty-five to life or they are sentenced to a life imprisonment and then you'll read in some little writing down there under it that says that means that they will be eligible for parole in twenty-five years or fifteen years, or something like that. That doesn't happen in Louisiana. If you are sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence, then that's what it means. You don't get to be put on probation. You don't get a chance to be put on parole. You don't get a chance to have your sentence suspended. You don't even getif you're familiar with ityou don't even get good time, which means you douhfor every one day in prison you do, they knock off a day. You don't get anything like that if you're convicted and sentenced under that statute. The only way that you could get out of jail before you were to die in prison would be if the governor were to pardon you or commute your sentence to a certain number of years, which would then make you eligible to be put on probationuhI mean, parole at some point.
Juror Sanders was the only member of the panel which heard this comment who was ultimately seated.
The third reference by the trial judge to the governor's power to pardon or commute a life sentence was made in response to a request by defense counsel:
Def.: Okay, now does anybody have a problem with what, I don't, I don't, with what a life sentence means? That is at some point you've got to balance. You've got two things out there. One of `em is death and we know what that is, assuming that it's imposed and we had better assume that it's imposed; the other one is a life sentence. Uhwe asked you all these questions on a form about life sentence, becauseuh
Def.: I'm going to ask the judge. Didn't you talk to this group, judge?
Court: I don't know whether I told this group or not, but I think I did.
Def.: You did.
Court: What life imprisonment means is life imprisonment and there isn't any way to get out. There's only one way and that's if the governor were to pardon you or commute your sentence. And I will also sayuhfor Mr. Perez's [defense counsel] benefit, but I don't know that I've ever seen that happen, since I've been doing this, on a first degree murder case.
Def.: All right, now, for you see we have to know. If we think we're balancing death on one hand against five years on the other hand, you know, then that's going to be one decision to make. On the other hand, death against a real serious life in prison sentence is another whole different story. Do you agree with that?
Juror: (Mr. Howard nodded his head.)
Def.: Because I don't want anyonewhat I don't want anyone doing is going into the jury room and voting death because they think a person is going to get a lenient sentence because of publicity on *17 the way things used to be done before we had a bad crime problem or maybe the way they're done in another state, huh? That, that's why we asked the judge to talk to you all about what's happening now in Louisiana, okay?
Juror: (Mr. Howard nodded his head.)
Juror Tabor was the only member of the panel which heard this comment who was ultimately seated.
The fourth instance was also precipitated by defense counsel:
Def.: And while I'm on that, if you noticed on the forms that we had you fill out, we asked what was your guess about what life imprisonment was. And the reason why we did that was that people have uhsome misperceptions about what life imprisonment is today in Louisiana, as opposed to even what used to be in Louisiana, twenty years ago before our crime problem got as bad as it is and, and the laws started getting tougher and tougher. Or what it is, is, maybe, in California and so the judgeuhI'm going to ask the judge to explain it to you because what we don't want is to have a person going into the jury room balancing these two, you know, you have to choose between one or the other. You know what one is if you give it. But if you think the other one is five years, then you know, you are not going to let the person walk out of the room with five years, huh? And so I don't want someone on just a misapprehension of what the penalty isthe real impact of the penalty is to give a person death and then any of us find out after the trial that it was a really serious penalty. So I'm going to ask the judge to go into that with you for a moment, huh?
Court: Ladies and gentlemen, in the uhfirst degree murder statute it says one of the verdicts that can be returned is life imprisonment without benefit of probation, parole, or suspension of sentence. And, basically, that means just that. In Louisiana, you don't get good; you don't get a shortened sentence for uha life in prison sentence. If you are sentenced to life imprisonment, basically, it means you'll be there the rest of your life unless the governor pardons you or commutes your sentence. And as long as I've been doing this, for fifteen years or so, I don't think I've ever seen the governor pardon a first degree murderer. So, basically, what I'm telling you is I think that a person would die in prison or get so sick at some point, you know, seventy or eighty years old or whatever, they may let him out somehow at that point. But it would mean, basically, a life imprisonment sentence. It doesn't mean that there is some way for him to get out in a short period of time. Some states have short sentences, like twenty-five to life and they're eligible for parole after a certain amount of time. We don't do that in Louisiana on a life sentence.
...
Def.: This is, this is what I wanted you all to know. Because ityou can't go in there with a misperception of the balancingin, inwhen you're in the jury room on these two sentences.
Alternate juror Arceneaux was the only member of the panel which heard this comment who was ultimately seated.
In addition to the above four instances, there were three other times the issue of the governor's commutation power arose; however, no juror who was ultimately seated heard any of the following discussions. We include them, however, to further illustrate the defense counsel's desire that the issue be raised by the trial judge with the prospective jurors. At one point, a prospective juror asked the judge whether "life in prison" meant exactly that, to which the judge responded, "Well, there is one way to get out, and that's the governor's pardon. But there is not any other way, like good time or parole or something like that." In another instance, defense counsel was questioning a prospective juror about why she believed a life sentence would result in a defendant's serving only 7 years. Defense counsel was concerned the prospective juror would be "balancing life againstdeath against seven years" in deliberating the death penalty. The woman was confused, and the prosecutor *18 asked the court for an instruction that "life means life." The judge then gave a short instruction, similar to the ones quoted above, regarding the nature of a life sentence. Finally, the judge gave a similar instruction to another sub-panel, because "Mr. Perez is so apt to point [it] out," and the judge wanted to "go ahead and take the burden away from him."
Initially, we note the record reveals defense counsel solicited many of these instructions. Additionally, when defense counsel did not request the instruction, he indicated his acquiescence in it by failing to object. Indeed, because defendant conceded guilt, a primary defense strategy during voir dire was to insure the jurors understood a life sentence in this case (1) would place defendant in prison for life subject only to the very limited exception of the governor's pardon power and (2) would adequately serve to protect society. Unlike the typical case, where a judge's or prosecutor's remarks emphasize the possibility of a reduction of a life sentence, perhaps leading the jurors to believe only the death penalty would sufficiently protect society from defendant, the comments of the judge in the instant case only served to help the defense's voir dire strategy. The defense decided to precipitate discussion about the meaning of a sentence of life imprisonment in order to assure prospective jurors "life meant life."[3] Thus, in defense counsel's words, when the jurors went to "balance" the two penalties, they would be given their proper meaning and weight. Defense counsel continued this line of questioning throughout voir dire. The tactic was clearly designed to convince jurors a life verdict would be a measured response, assuring the safety of society while punishing defendant with the harshest penalty short of death. The trial judge's remarks were of inestimable value to defendant. Further, to the extent defendant raised the issue with the desire that the judge convey to the jury the virtual certainty that defendant would serve out a life sentence without referring to the governor's power to pardon or commute, this would have constituted an erroneous statement of law, and the judge was not required to so restrict his definition of a life sentence.
Additionally, only four of the jurors ultimately seated, and one alternate who did not participate in deliberations, heard any one of the complained-of comments by the trial judge in voir dire. The governor's power to commute a sentence or pardon a prisoner was not discussed at all by the State or the trial court during the guilt or penalty phases of this trial. Rather, the court instructed the jurors their decision was to "now determine whether the defendant should be sentenced to death or to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence."
In State v. Lindsey, 404 So.2d 466 (La. 1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983), the defendant alleged it was error for the judge to give the jury an instruction on the governor's pardon power during jury deliberations. This court remanded for a new sentencing hearing, holding that conditions under which a person sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence can be released at some time in the future are not a proper consideration for a capital sentencing jury and should not be discussed in the jury's presence. Lindsey, 404 So.2d at 487. We noted, however, it was "possible for cases to arise in which this Court can conclude that a death penalty imposed after future remedial measures are discussed at the sentencing hearing is not reversible." Id.[4]
*19 That references made during the penalty phase to the possibility of a gubernatorial pardon, although impermissible, would not always require reversal came to pass in State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985). Therein, the defendant called a former Director of Jails and Prisons to testify during the penalty phase as to how many defendants sentenced to life for murder had been pardoned. The prosecutor cross-examined the witness on whether it was the governor who had the final decision to pardon a defendant. This court held the references by the State did not require reversal under Lindsey because (1) the problematic comments occurred during cross-examination in the penalty phase and not in the closing argument; (2) the references came during cross-examination of a defense witness in response to questioning by defense counsel; (3) the "defense opened the door on the subject" and further pursued the topic; (4) defense counsel did not ask the court to caution the jurors and did not object; and (5) the information given the jury members fell far short of the damaging comments made in Lindsey. Glass, 455 So.2d at 668-69.
Likewise, in State v. Williams, 490 So.2d 255 (La.1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987), the defendant objected to the district attorney's statements in his closing argument in the penalty phase which implied that perhaps the law could change and murderers sentenced to life would some day be released for work furloughs. This court found the reference did not constitute reversible error. "[T]he fact that the possibility of release is discussed in the jury's presence does not mandate that the case be remanded for resentencing. A case should be remanded only when the discussion presents a genuine risk that the jury's attention will be deflected from the ultimate significance and finality of the penalty recommendation or misguide the jury's sentencing discretion by the introduction of inappropriate considerations." Williams, 490 So.2d at 263. In Williams, because the district attorney's comments were made in response to a statement by the defense that the defendant would not be eligible for furlough if sentenced to life in prison, it was the defendant "who opened the door for the discussion of the topic by first referring to it in his closing argument." Id.
Defendant relies on State v. Jones, 94-0459 (La.7/5/94), 639 So.2d 1144, and State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382, to support his argument the trial court's references during voir dire to the gubernatorial pardon power constitute reversible error. In Jones, this court held unconstitutional an amendment to La.C.Cr.P. art. 905.2 which had mandated that trial courts charge capital jurors during the penalty phase relative to the governor's power to reprieve, pardon or commute punishment:
The possible prejudicial effect of the instruction perniciously undermines the reliability of the capital sentencing hearing and the soundness of the process by which a jury arrives at the recommendation of death. It purposefully injects an irrelevant, arbitrary factor into the sentencing hearing risking speculation and chancing the recommendation of the death [penalty] from a capital jury lacking confidence in [the] governor's ability to wisely use the clemency power ... Injecting this arbitrary factor into the capital sentencing process undermines the fundamental fairness requisite for the capital hearing, a hearing which requires a greater degree of scrutiny due to the qualitative difference between the death penalty from other statutory punishments.
Jones, 94-0459 at p. 13, 639 So.2d at 1153 (citation omitted).
On November 18, 1995, however, the people of Louisiana voted to amend the Louisiana Constitution to allow for the enactment of a statute that would require trial courts to inform the jury of the governor's clemency power during the sentencing hearing. Defendant's trial herein was held May 8-15, 1995, and thus, at the time of trial, Jones, prohibiting the mandatory charge in the penalty phase, was still in effect. Consequently, the trial court was not required by statute to, and did not, charge the jury at the penalty phase on the governor's power to pardon, reprieve or commute. Even assuming the constitutional amendment allowing for a statute *20 mandating such an instruction would not apply in a case where the trial took place prior to its enactment but the opinion on direct appeal was issued well after the passage of the amendment, see, e.g., Cousan, supra, we find Jones, and Lindsey for that matter, factually distinguishable from and inapplicable to the instant case.
Unlike Jones and Lindsey, the objected-to comments were made during voir dire, many days before jury deliberations, and not during the penalty phase. They were made by the judge in response to prospective juror inquiries, to help clarify prospective jurors' positions at the request of the attorneys, and, in many cases, in response to defendant's requests for assistance. The defense did not object to or request different instructions. The comments were phrased not to emphasize the governor's power to pardon or the likelihood of an early release, but, instead, to impress upon the jury panels the improbability defendant would ever be released from prison if he received a life sentence. The judge's instructions could only have been of great benefit to the defense which was concerned the jury would be "balancing death on the one hand against five years on the other hand." Indeed, the defense focused all of its resources on the penalty phase, given defendant's concession of guilt and the brutal, vicious, senseless nature of the crime. Its strategy, in order to protect defendant from the death penalty, was to emphasize to the jury in voir dire the improbability of defendant's release under a life sentence, i.e., that the only way a first degree murderer sentenced to life could be released would be by gubernatorial pardon or commutation, something which rarely occurred. Thus, in the context of the entire voir dire, the judge's comments did not deflect the jury's attention from the ultimate significance and finality of the penalty recommendation, did not prejudice defendant, and did not misguide the jury's sentencing discretion by the introduction of inappropriate considerations. This assignment of error lacks merit.
In a sub-argument, defendant asserts the trial court erred when it instructed the jury defendant would be released from a life sentence without parole because of illness. However, only the alternate juror heard this comment. Any presumption of prejudice regarding this comment would be speculative at best, considering the alternate did not participate in any deliberations. This assignment also lacks merit.

Initiation of Voir Dire/Assignment of Error 10
Defendant asserts the trial court erred in allowing the State, over the defense's continual objection, to initiate the voir dire of each jury panel. The identical argument was made and rejected in State v. Taylor, 93-2201, p. 20 (La.2/28/96), 669 So.2d 364, 384, cert. denied, ___ U.S. ___, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996), wherein this court noted, "[t]he state's ability to question veniremen first is well established." Article 786 of the Code of Criminal Procedure provides, "[t]he court, the state, and the defendant shall have the right to examine prospective jurors," intimating the order in which the legislature intended voir dire to be conducted. The trial judge has great discretion as to the scope and conduct of voir dire, and rulings related thereto should not be disturbed on appeal absent a clear abuse of discretion. State v. Allen, 95-1754, p. 10 (La.9/5/96), 682 So.2d 713, 722. Given the above and the fact defendant was not prevented from objecting to any misstatements of law made by the State, from seeking limiting instructions from the trial court, or from seeking to rehabilitate any juror on voir dire, we find the trial court did not abuse its vast discretion in allowing the State to initiate questioning of all the jury panels. This argument lacks merit.

Specific Intent/Assignment of Error 11
Defendant asserts the trial court erred in allowing the State to improperly instruct the jury panels on specific intent and in failing to provide the panels with a curative instruction. Specifically, defendant alleges the State improperly instructed the jury as to the definition of specific intent in violation of Sandstrom v. Montana, 442 U.S. *21 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), without a curative instruction by the judge.[5]
We note at the outset defendant failed to object to the prosecutor's statements regarding intent and did not request a curative instruction. In Taylor, 93-2201 at p. 7, 669 So.2d at 369, this court held the "scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not." In Cousan, 94-2503 at p. 8-9, 684 So.2d at 388, and in State v. Roy, 95-0638, p. 15, n. 7 (La.10/4/96), 681 So.2d 1230, 1240, n. 7, cert. denied, ___ U.S. ___, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997), we noted this court had not yet decided whether Taylor should be extended to bar review of unobjected-to alleged errors which occurred during voir dire, and pretermitted the issue in those cases. We again find it unnecessary to reach this issue herein, however, because we find the statements made by the prosecutor in this case were not misstatements of the law, and, even if they were, did not prejudice defendant as the jurors were subsequently correctly charged by the court.
In Sandstrom, the United States Supreme Court addressed the issue of whether, in a case in which intent is an element of the crime charged, the jury instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts," given at the close of the guilt phase, violates the Fourteenth Amendment. The Court held the language of the instruction, and particularly the word "presumes," gives the jury the impression the presumption is mandatory rather than a permissible inference, improperly shifting the burden of proof from the State to the defendant on the issue of intent. The prosecutor in the instant case did not misstate the law in violation of Sandstrom. Although the word "presume" was used, when viewed in context, the remarks reflect an accurate statement of the law and did not contain a mandatory presumption of the type prohibited in Sandstrom. Furthermore, even if the remarks did misstate the law, "[a] misstatement of the law by the prosecutor does not prejudice a defendant if the judge subsequently admonishes or correctly instructs the jury." Roy, 95-0638 at p. 14-15, 681 So.2d at 1239. In the instant case, defense counsel never requested an admonition and, therefore, the district judge never admonished the jury. However, the judge ultimately read the impaneled jurors a correct statement of the law when they were instructed at the conclusion of the guilt phase of the trial. This assignment of error has no merit.

Preliminary Instructions/Assignment of Error 13
Defendant additionally contends the trial court should have provided the jury panels with a complete set of preliminary instructions, but instead allowed the State to improperly instruct the panel members during voir dire on many issues. The record, to the contrary, reveals the trial judge did give *22 a set of general preliminary instructions to each panel and sub-panel of prospective jurors called for examination on voir dire. Furthermore, defendant did not object to the scope of the trial judge's instructions on voir dire or to the State's inclusion of additional instructions during its opportunity to question the prospective jurors and did not request any curative instruction by the trial court. Finally, defendant himself was not prevented from advising the jury as to its interpretation of the law on the same issues discussed by the State. This assignment lacks merit.

Sequestration of Jury/Assignment of Error 14
Defendant contends reversible error occurred when the trial court lifted its sequestration order for the jury on May 14, 1995, Mother's Day, and allowed the jurors to visit with their families for three hours without prior knowledge to, or agreement by, the defense. Defendant's representations of the record are inaccurate. By the end of the day on Saturday, May 13, 1995, and after more than five days of voir dire, the selection of the twelve-member jury was complete. At the beginning of the session on Saturday, the following colloquy took place, which clearly indicates the topic of family visits had been discussed off-record.
The Court: All right. Let's go back on the record in the matter of State of Louisiana v. Allen Robertson. UhI have thought about it and I think if we take the day off, we'll let their families come and visit them or something.
Mr. Perez: (Defense Attorney) Well, let's waituhI think what I would do if I was you, is not to swear the entire jury in until Monday morning, huh? Even though they're under sequestration, huh?
Mrs. Burns: (Prosecutor) Yes.
Mr. Perez: Huh?
The Court: Yes. I mean I just wanted
Mr. Perez: I mean, it would beI, I think you would have a problem if they're, if they're finally sworn than if they're not finally sworn, huh?
Mrs. Burns: Yes.
The Court:That's fine, I just thought since it's mother's day, if we take the day off, I'd let their families come and visit them.
Mrs. Burns: Judge, do you think there might be any problem with, like, anybodyuhwho is being, like, Mr. Mom right now, like really bitching and complaining?
The Court: I've thought about it. That, that's the down side, that's why I threw this out, let's talk about it.
Mrs. Burns: Like, Mr., Mr. Soni, is the one I was thinking about since he's been calling.
The Court: Huh?
Mrs. Burns:About the kids not being used to him. That's the only thing. I would hate to get to that point.
The Court: Well, you all keep thinking about it. We'll decide about it when we get through here today.
Mrs. Burns: Maybe we can let them wave at them or something?
The Court: Yes.
The eleven jurors who had been impaneled and sworn by that point were brought into the courtroom for further instructions from the court. The trial judge informed the jury: "We have eleven jurors and we're going to try and finish today so, hopefully, maybe we can take Mother's Day off or something."
On Sunday, May 14, after the parties had selected the alternate and were discussing whether an additional alternate was necessary, the following discussion occurred:
Mrs. Burns: Judge, we haven't had any problems with any of these other people calling in or anything so farof the other jurors that we've seated? That would be my only
Mr. Perez: Yeah.
The Court:We had that one woman that one day who said her husband called her.
Mrs. Burns:Yes.
The Court: Since then nobody else has said a word.
Mrs. Burns: That's fine then.

*23 The Court: By the way, you all don't know this, but they are visiting with their families right now.
Mr. Perez: Okay.
The Court: I let them have a family visit in the room from two to five today.
Mr. Perez: Okay.
The Court: Because they asked me that when you all left last night. They said, could we do that, and I couldn't look `em in the face and tell `em no, at that point, because they've been sitting down in that room since one o'clock yesterday. I need to ask Ms. Arceneaux [the alternate] about sequestration. Bring her in. I think, as a matter of fact, the only call we've got is from Ms. Soni's husband.
At the time of this trial in May of 1995, La.C.Cr.P. art. 791 provided, in pertinent part, that "[i]n capital cases, after each juror is sworn he shall be sequestered."[6] Sequestration requires the jury be secluded from outside communication. Consistent with Article 791 prior to its amendment, there existed a jurisprudential rule that an accused could not consent to waive the sequestration requirement. State v. Luquette, 275 So.2d 396 (La.1973); State v. Craighead, 114 La. 84, 38 So. 28 (1905). The rationale behind the rule was that a defendant should not have to be placed in the position of having to consent or perhaps prejudice the jury by withholding consent. Taylor, 93-2201 at p. 32, 669 So.2d at 381. In Taylor, however, this court specifically overruled those cases prohibiting waiver of the sequestration requirement, finding the jurisprudentially-created prohibition unnecessary since the deliberations on whether to waive the sequestration requirement could be held outside the presence of the jury.[7]Taylor, 93-2201 at p. 33, 669 So.2d at 381. Thus in Taylor, we recognized that even under the previous version of Article 791, a defendant could consent to the waiver of the sequestration requirement.
The earlier-quoted portions of the transcript of the voir dire belie defendant's claim he neither knew nor acquiesced in waiving sequestration to permit the jurors to visit with their families on Mother's Day. In fact, it was defense counsel who suggested the very procedure which effectively waived sequestration requirements by delaying swearing of the jurors as a panel under La.C.Cr.P. arts. 790 and 791. Defense counsel consented to the visit, offered a solution to the "problem" the trial court would have if the jurors would have been sworn in on Saturday, and did not object or express any dissatisfaction with the trial court's actions at any time.
Defendant makes the additional subarguments that the sequestration order was violated when one juror received a telephone call from her spouse and that the court had improper contact with the jurors. The record is vague with respect to the phone call, although it appears one juror's husband, Mr. Soni, called to complain "about the kids not being used to him." There is no indication from the record the call prejudiced defendant in any way or that the juror and her spouse discussed anything related to the case. Furthermore, defendant did not complain or object, call to question the juror individually, or request a hearing to develop evidence. The record fails to support any claim of error or prejudice on this issue.
Similarly, we find no merit in defendant's assertions there was improper contact between the trial judge and jury beyond that which was necessary for the judge to respond to the jury's request to visit their families on Mother's Day, a visit we have previously explained was consented to by defendant. In Allen, 95-1754 at p. 19, 682 So.2d at 727, the defendant argued the sequestration rule was *24 violated when the judge told jurors in the jury room they would have to go back to the courtroom for further instructions. This court held there was no error because "[t]he rule of sequestration does not `bar communication between the judge and jury when such communication is within the bounds of trial related necessity.'" (quoting State v. Copeland, 419 So.2d 899, 906 (La.1982)). Furthermore, as with the complained-of telephone conversation, there were no objections, complaints, or calls to question any jurors made by defendant, nor was there any request for a hearing to develop evidence made by defendant. The record fails to support any claim of error, and no prejudice has been demonstrated.

Peremptory Challenge/Supplemental Assignment of Error 3
Defendant argues the trial court committed reversible error when it allowed the State to use a peremptory challenge to remove prospective juror Sandy Douglas Albert, a black woman, from the panel in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In Batson, the United States Supreme Court formulated a three-step analysis to determine whether jury selection had been unconstitutionally compromised by impermissible racial discrimination. First, a defendant must make a prima facie showing the State has used peremptory challenges to exclude prospective jurors on the basis of race. Second, if the requisite showing is made, the burden shifts to the prosecutor to come forward with a race-neutral reason for the strike. Lastly, if a race-neutral explanation is tendered, the trial court must then decide whether the defendant has proved purposeful racial discrimination. State v. Green, 94-0887, p. 23-24 (La.5/22/95), 655 So.2d 272, 287-88.
After defendant objected to the State's exercise of a peremptory challenge as to Ms. Albert, the trial court never acknowledged defendant had made a prima facie case of purposeful discrimination, and, instead, specifically said the State had exercised all of its challenges in a racially neutral manner. Likewise, the prosecutor specifically stated she did not believe such a showing had been made, but nevertheless voluntarily offered racially neutral reasons for challenging Ms. Albert. In Green, 94-0887 at p. 24, 655 So.2d at 288, this court said a defendant could make out a prima facie case of racial discrimination by offering facts such as:
[A] pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
Referring to these factors, the record shows the prosecutor in voir dire had not made any statements or taken any actions which seemed in any way racially discriminatory. In fact, the record reveals that when defendant made his Batson challenge, the State had exercised only 6 peremptory challenges, excusing four white persons and two black persons. Additionally, only the day before defendant made his challenge, the State had accepted a black prospective juror whom the defense subsequently struck. Given the above, we agree with the trial judge that defendant did not prove a prima facie case of discrimination, and, therefore, it is unnecessary for us to address the remainder of the Batson analysis.
In this assignment of error, defendant also makes the sub-argument that the method of dividing the venire into 5 panels and calling them in that order "front-loaded" the panels with white prospective jurors and did not result in a fair representation of blacks on the jury which, ultimately, was composed of eleven white jurors, one Asian-Indian juror, and one white alternate. The record shows the venirepersons were randomly divided by card shuffle into 5 panels, labeled "A" through "E". Each panel was comprised of 24 jurors. The panels were called one at a time for general instructions and questioning and were then broken up into sub-panels for detailed individual questioning. Panel A was composed of 4 blacks, 19 whites, and 1 Asian-Indian. Panel B was composed of 9 blacks and 15 whites. Panel C was composed of 11 blacks and 13 whites. *25 The sub-panel of Panel D from which the final, alternate juror was ultimately selected was composed of 1 black and 5 whites. Thus, at the time voir dire was completed, and the alternate juror selected, the defense and prosecution had reviewed 25 black prospective jurors (32% of total) and 52 white prospective jurors (68%). We do not find defendant was prejudiced in any way by the method in which the panels were selected or examined or deprived in any way of a venire which did not constitute a fair crosssection of society. This assignment of error has no merit.

Opportunity to Rehabilitate/Supplemental Assignment of Error 5
Defendant asserts the trial court erred in granting the State's challenge for cause against prospective juror Lillie Mae Lewis without giving the defense an opportunity to attempt to rehabilitate her. Upon examination, Ms. Lewis indicated she would vote against death under all circumstances and believed only in life imprisonment. The record shows the following later took place after the judge inquired if there were any challenges for cause:
Ms. Burns: Yes, your honor. Judge, at this time, state would make a challenge as to juror no. 282, Ms. Lewis, based upon her response that she could not impose the death penalty under any set of circumstances. She would not be a legally qualified juror, under article 798, subsection 2(a).
The Court: Mr. Perez, do you have any questions you'd like to ask that juror in that regard?
Mr. Perez: No, I don't think I would question the juror. I have objected to the constitutionality of 798(2)(a). I would re-erect that objection.
Defendant is correct in his argument that an accused has the right to a full and in-depth examination of prospective jurors in order to provide for the intelligent exercise of challenges and to test the individual's qualifications to serve. La. Const. Art. I, Sec. 17. Subject to a trial court's broad discretion in the conduct of voir dire and in ruling on challenges, this right entitles an accused to reexamine, requestion, reinstruct or rehabilitate a juror. This right is particularly important in a capital case when the juror is being examined on his views of the death penalty. However, defendant's assertion he was denied the opportunity to rehabilitate Ms. Lewis is a misrepresentation of the record. The voir dire transcript shows Ms. Lewis was adamant in her opposition to the death penalty. After the State challenged Ms. Lewis because of her inability to consider capital punishment, the judge specifically asked defense counsel if he had any questions for Ms. Lewis to which counsel responded in the negative. Because defense counsel acquiesced in the challenge by declining the court's offer of rehabilitation, and because the court did not commit error in excusing Ms. Lewis for cause,[8] this assignment lacks all merit.

Challenges for Cause/Assignment of Error 12 and Supplemental Assignment of Error 4
Defendant alleges the trial court erred by utilizing an inappropriate standard for challenges for cause made under La.C.Cr.P. art. 798(2). Although the title of defendant's assignment of error actually refers to La. C.Cr.P. art. 798(2)(a), his arguments in brief can be read only as referring to subsection (b) of that article. However, we note defendant continually objected to the constitutionality of subsection (a) during the trial. As such, we will address both arguments.
With respect to subsection (b), defendant asserts Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) provides the constitutional standard governing when jurors can be excused for cause with respect to their views on capital punishment, and that excusing a juror for cause under the standard set forth in La.C.Cr.P. *26 art. 798(2)(b) violates Witt. In Witt, the Supreme Court held "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424, 105 S.Ct. at 852. Louisiana. C.Cr.P. art. 798(2)(b) provides it is good cause for challenge on the part of the State where:
(2) The juror tendered in a capital case [] has conscientious scruples against the infliction of capital punishment and makes it known:
...
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath....
Thus, while Witt allows for the excusal for cause of a juror whose views prevent or substantially impair "the performance of his duties as a juror," La.C.Cr.P. art 798(2)(b) allows a juror to be excused for cause whose views prevent or substantially impair him from "making an impartial decision as a juror." Defendant's position is that the scope of Article 798(2)(b) is broader than that constitutionally allowed under Witt and would result in allowing jurors whose bias against the death penalty is short of a substantial impairment to be excused for cause in violation of defendant's constitutional rights. As a result, defendant alleges it is a possibility thirteen jurors excluded for cause by the trial court in response to State requests were improperly dismissed.
In State v. Tart, 93-0772, p. 14, n. 3 (La.2/9/96), 672 So.2d 116, 123, n. 3, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996), this court noted Witt's standard for state cause challenges was embodied in La.C.Cr.P. art. 798(2). Certainly, "making an impartial decision as a juror" is one of the "duties" of a juror described in Witt, and the variation in the semantics employed under the two standards is insignificant.
Regarding subsection (a), because the issue is not briefed, it is difficult to understand the defendant's argument on why excusing a juror for cause under subsection (a) somehow impermissibly broadens the scope of jurors excusable under Witt. Under La.C.Cr.P. art. 798(2)(a), a juror may be excused for cause if he has "conscientious scruples against the infliction of capital punishment," and would automatically vote against the death penalty because of his capital punishment beliefs. This standard falls within Witt, which limits excusals for cause to those jurors whose views on capital punishment would substantially impair the performance of their duties as jurors. It is the duty of a juror to make an impartial decision only after hearing all of the evidence and not as a result of any preconceived beliefs.
Furthermore, defendant does not allege in this assignment any of the jurors excused for cause by the State and trial court were, in fact, improperly excused under either the Witt standard or his appreciation of the Article 798(2) standard. Nor does defendant discuss any individual juror's voir dire responses or the specific basis the State had for urging disqualification for each. For these reasons, this assignment lacks merit as does the assignment wherein defendant specifically alleged application of an improper standard resulted in the improper excusal for cause of prospective jurors John Fielding and Rosalind Johnson.

Death Penalty and Religious Beliefs/Supplemental Assignment of Error 6
In this assignment, defendant argues the trial court erred when it allowed the State to exercise peremptory challenges against prospective jurors Bernardine Duncan Lebrane, William Townsel and James Coday when these jurors expressed their opposition to the death penalty was rooted in their religious beliefs. Defendant argues that since the Equal Protection Clause guarantees peremptory strikes cannot be used to purposefully discriminate on the basis of race or gender, it is logical that exclusion of a juror on the basis of his religious beliefs is likewise unconstitutional.
At the outset, we note the defense failed to object to the use of peremptory challenges as *27 to these three prospective jurors. However, as explained earlier, this court has not yet addressed the issue of whether the procedural bar set forth in Taylor should be extended to unobjected-to alleged errors occurring during voir dire. We need not do so now because the trial court did not commit any error with respect to this assignment. In State v. Sanders, 93-0001, p. 20 (La.11/30/94), 648 So.2d 1272, 1288, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), the same argument was made with respect to jurors who had been dismissed for cause because of their views on the death penalty which happened to have been prompted by their religious beliefs. This court observed:
[E]ven if the reluctance to impose the death penalty were religious in nature, this court has adopted the Witherspoon [v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)] ... and Witt standards. This court has on numerous occasions reviewed the disqualification of jurors who stated a religious basis for their inability to impose the death penalty, and has in no instance found a constitutional violation.
Certainly the same reasoning applies to the instant case and the State's use of its peremptory challenges. It is irrelevant for purposes of a cause challenge that a prospective juror's views on the death penalty which would substantially impair his ability to be an impartial juror are rooted in his religious beliefs. It is not the prospective juror's religion per se which justifies the challenge for cause but his views on the death penalty, regardless of their source or impetus. Similarly, if the prosecutor believes a person's views on the death penalty, although not strong enough to warrant a challenge for cause, justify the State's use of a peremptory challenge to excuse that juror, it is irrelevant that the prospective juror's views arise out of any religious belief. The record shows these three prospective jurors were not stricken by the State because of their religion but because, inter alia, they indicated a hesitancy with regard to the imposition of the death penalty. This assignment lacks merit.

Reasonable Doubt/Supplemental Assignment of Error 2
Defendant asserts reversible error occurred when the trial court erroneously instructed prospective jurors during voir dire that reasonable doubt was "a doubt you can give good reason for," and one "based on reason and common sense." Defendant admits a proper "closing instruction" was given, but argues the error occurring during voir dire infected the guilt and penalty phases. It appears the district court properly charged the jury as follows at the conclusion of the guilt phase.
Reasonable doubt is a doubt based on reason and common sense, and is present, when, after you have carefully considered all of the evidence, you cannot say that you are convinced of the truth of the charge. A reasonable doubt is not a mere slight misgiving or a possible doubt. You may say it's self defining; it's a doubt that a reasonable person could entertain; it's a sensible doubt.
A misstatement of law by the prosecutor does not prejudice a defendant if the judge subsequently admonishes or correctly instructs the jury. Roy, 95-0638 at p. 14-15, 681 So.2d at 1239-40. Similarly, a trial court's misstatement of the law during voir dire examination does not require reversal of a defendant's conviction if the court properly charges the jury at the close of the case. State v. Cavazos, 610 So.2d 127, 128 (La. 1992). Because the defense counsel herein never objected to the judge's instruction given during preliminary instructions in voir dire, the judge never admonished the jury. However, at the close of the guilt phase, the judge properly instructed the jury. Under these circumstances, it cannot be said defendant's right to a fair trial was not sufficiently protected or that he was prejudiced by the judge's original instruction during voir dire. This assignment lacks merit.

Aggravating Circumstances/Assignments of Error 15 and 18
Defendant asserts the jury was erroneously and repeatedly charged during voir dire that if it found defendant guilty of one of the underlying felonies at the guilt phase, "it *28 had also found one of the aggravating circumstances beyond a reasonable doubt." Regarding these instructions to the jury during voir dire, we note initially defendant did not request any special instructions in this regard nor did he object to the trial judge's statements. Additionally, the trial judge correctly instructed the jury on the State's burden of proof regarding the guilt and penalty phases at the close of both of these phases of trial, curing the error.[9]Cavazos, 610 So.2d at 128. The State was not alleviated of its burden of having to prove an aggravating circumstance during the penalty phase. The trial court in penalty phase instructions did not mention defendant's concession of guilt nor did it charge or intimate the jury's guilt phase findings somehow relieved it of the responsibility of deciding punishment based on a fair assessment of all relevant criteria including aggravating and mitigating evidence. Jurors were charged relative to the State's burden of proof and the requirement that they must find an aggravating circumstance beyond a reasonable doubt before voting to impose the death penalty.
At the penalty phase, the State reintroduced all of the evidence it had introduced at the guilt phase necessary to prove the elements of the underlying felonies of armed robbery and aggravated burglary. At the conclusion of the penalty phase, the trial court instructed the jury as to the alleged aggravating circumstances and gave the jury definitions of the underlying felonies. There is no support in the record for defendant's contention the trial judge's statements in voir dire, even if improper, gave the jury the impression in the penalty phase it did not have to find the existence of an aggravating circumstance beyond a reasonable doubt.

GUILT PHASE

Admissibility of Confession/Assignments of Error 2 and 3
In these related assignments of error, defendant argues the trial court erred in admitting defendant's confession (1) because it was the product of police coercion after defendant had invoked his right to remain silent, and (2) because it was taken in violation of the Due Process Clause because the reinitiation of the interrogation was unrecorded. The record reveals defendant was arrested at the home of his girlfriend pursuant to a warrant charging two counts of first degree murder at about 1:10 a.m. on January 3, 1995. He was given verbal Miranda warnings and transported to the Mayflower Street station house. After additional Miranda warnings, defendant executed a written waiver of rights and agreed to give a taped statement. The statement began at 2:25 a.m. with defendant repeatedly denying any complicity or involvement in the Prestenback murders. The statement concluded with the following exchange between various officers and defendant:
Officer: We're fixing to leave right after this.
Officer: Okay, and uh, as far as they go ya'll gonna split pretty soon then right.
Officer: As soon as we get finished with this, we gonna take him and book him in.
Officer: Okay Al, so you don't want to say no more about what happened over there at them old people's house.
Def.: Uh uh.
Officer: You didn't have nothing to do with it?
Def.: I'm serious man, I didn't have nothing to do with the murder, murder, I ain't done it.
Officer: You ain't got nothing else you want to say?
[no transcribed response]
Officer: Was you treated fair here today[?]
Def.: Yea.
Officer: Nobody beat you up?
Def.: No.

*29 Officer: Nobody promised you anything?
Def.: No.
Officer: Threatened you?
Def.: No.
Officer: We played square with you just like we said we was doing huh?
Def.: Yea
Officer: Got anything else you want to add?
Def.: I didn't kill them people, though.
Officer: We gonna conclude the statement, then. It's approximately 3:12 in the morning, date is 1/3 of '91. We're still at 704 Mayflower in the Interrogation Room at the, uh, Detective Office.
Tape Stops.
The recorder was turned off at 3:12 a.m. Twelve minutes later, at 3:24 a.m., it was turned on and a sobbing defendant then gave a detailed confession. Testimony in the record indicates that just after the recorder was turned off at 3:12 a.m., Det. James Dietrich, who had been observing events through a one-way mirror, entered the interview room. He joined Lt. Hillburn, Sgt. Sam Miceli and Det. Terry Wilson in the interrogation room with defendant, sat close to defendant, put a hand on his leg, and told defendant he would feel better if he got "something off his chest" and unburdened himself prior to "meet[ing] his God." Defendant then started crying and admitted the murders. The recorder was turned back on and, after defendant was again asked whether he understood his rights as contained in the waiver of rights form he had signed, defendant gave a detailed confession. At no time did defendant ask for the questioning to stop nor did he request an attorney.
Admissibility of the statements was litigated at defendant's first trial, with the trial judge denying his motion to suppress. The merits of this ruling were not reached on appeal because of our reversal. In the instant trial, defendant objected to the admissibility of the statements subject to the "preservation of [his] rights, under the original motion to suppress evidence." This objection was overruled, and a redacted version of the tape, containing portions of the initial and subsequent statements, was played for the jury.
Defendant's initial argument is that he invoked his Fifth Amendment right to remain silent when he responded "uh uh" to the policeman's question as to whether he wanted to say anything more about what happened. Thus, he argues, the subsequent coercive questioning of him by Det. Dietrich constituted a violation of his previously invoked right to silence. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court provided a person in custody must be given certain warnings before interrogation may commence in order to safeguard his Fifth Amendment right against self-incrimination.[10]See also State v. Davis, 92-1623, p. 19 (La.5/23/94), 637 So.2d 1012, 1024, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). After these warnings have been given, if the individual indicates at any time that he wishes to remain silent, the interrogation must cease. However, when the protections provided by Miranda are not specifically invoked, police may continue to question the suspect in the hope of obtaining a statement. Green, 94-0887 at p. 10, n. 8, 655 So.2d at 280, n. 8. For a statement which was obtained where an individual's right to remain silent was not invoked after being informed of his Miranda rights to be admissible, it is the State's burden to show defendant waived his rights prior to speaking. Davis, 92-1623, at p. 19, 637 So.2d at 1024; Green, Id. The waiver must be knowing and intelligent under the totality of the circumstances which include the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Green, 94-0887 at p. 11, 655 So.2d at 280.
In light of the above, our inquiry begins with whether or not defendant was advised of his rights to remain silent and to speak with *30 an attorney under Miranda. Defendant was Mirandized at his girlfriend's house upon his arrest and again, later, when he arrived at the station. He signed a waiver of rights form containing a list of his rights. After defendant spoke with Det. Dietrich and prior to his confession, the tape was turned on again, and defendant was again reminded of the rights which were contained in the written waiver. Defendant was advised several times prior to his confession of his Miranda rights.
Advisement of rights is not enough for admissibility, however. Defendant must knowingly, voluntarily and intelligently waive his right to remain silent. In Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (citations omitted), the Supreme Court discussed the nature of a voluntary, knowing and intelligent waiver of Miranda rights.
The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
In the instant case, it is clear defendant's waiver of his right to remain silent was a product of his free choice and was made with a full awareness of the right being waived. There is no evidence in the record defendant was intimidated, coerced or deceived in any way which would have led him to waive his right to remain silent for any reason other than as a function of his free will. At the end of the first statement, defendant admits he was not coerced, threatened, physically harmed or treated unfairly by the detectives interrogating him. During the second statement wherein defendant confessed to the murders, there is no indication defendant's decision to speak was anything other than a result of his choice to do so. The record is devoid of any suggestion the police resorted to any pressure, physical or psychological, to elicit the statements from defendant. Additionally, there is no question defendant comprehended the rights afforded him and the potential consequences of a decision to relinquish them. Defendant was informed of his rights many times, both verbally and in the waiver of rights form which he signed. Furthermore, an individual's prior experiences with the criminal justice system are relevant to this inquiry because they may show the individual has, in the past, and, perhaps, on numerous occasions, been informed of his constitutional rights against self-incrimination both by law enforcement and judicial officers. Green, 94-0887 at p. 17, 655 So.2d at 284. "One of the ways that people are educated and gain an understanding of things is through repetition, through repeated exposure, and it [is] permissible for the trial court to read [an individual's] Miranda waivers ... against [that individual's] criminal history." Green, Id. Defendant had been arrested, and in some cases, convicted, innumerable times, giving rise to the permissible inference he was more than familiar with his right to remain silent. In light of the above, we find defendant was properly advised of his rights and voluntarily chose to waive his right to remain silent.
Once an individual has waived his rights, he may be interrogated by the police and any freely and voluntarily made statement will be admissible at trial. However, a prior valid waiver of rights does not prohibit or prevent this individual from subsequently invoking his rights during questioning, and, as stated earlier, upon an invocation of the right to remain silent, all interrogation must cease. "[I]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627. Whether interrogation must cease until reinitiated by the individual is determined by whether the individual "actually invoked" his right to counsel [or his right to remain silent] either prior to or during the investigation. Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492, *31 83 L.Ed.2d 488 (1984). Defendant's position is that his statement, "uh uh," in response to the question: "Okay Al, so you don't want to say no more about what happened over there at them old people's house," constitutes an invocation of his right to remain silent, and that Det. Dietrich's subsequent discussions with him, as well as the detectives' subsequent questioning of him, were prohibited by Miranda. Defendant is incorrect.
In Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court addressed the issue of whether the arrestee had "actually invoked" his Miranda right to counsel, as opposed to his Fifth Amendment right to remain silent, for purposes of triggering Miranda's proscription against further interrogation. The Supreme Court held that an equivocal or ambiguous statement, such as "maybe I should talk to a lawyer," was insufficient to constitute an invocation of the Miranda right to counsel, and that an unambiguous, clear assertion of the right was necessary to trigger the rule that interrogation cease upon invocation of the right.
Analogizing to the instant case, defendant's indication he had nothing further to say about the crimes does not reasonably suggest a desire to end all questioning or to remain silent. Defendant's negative reply, "uh uh," cannot plausibly be understood as an invocation, ambiguous or otherwise, to cut off questioning in all respects. Rather, defendant was willing to talk to authorities even after the "uh, uh" response as indicated by his continuing to respond to questions and to assert his innocence. Defendant never indicated he did not want to speak to the police at all, only that he had nothing to say about the murders. The fact defendant continued to speak to police reflected an intent to continue the exchange, thus giving effect to the "fundamental purpose of ... Miranda," which was to "assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process." Green, 94-0887 at p. 10, n. 8, 655 So.2d at 280, n. 8 (quoting Connecticut v. Barrett, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987)). Because defendant did not invoke his right to remain silent prior to or during questioning, it was permissible for the investigators to continue to question him.
In addition to the above prerequisites, before a confession may be introduced into evidence, the State must affirmatively show the statement itself was free and voluntary, and not the result of fear, duress, intimidation, menace, threats, inducements or promises. State v. Lavalais, 95-0320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053, cert. denied, ___ U.S. ___, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997); Davis, 92-1623 at p. 19, 637 So.2d at 1024; State v. Simmons, 443 So.2d 512, 515 (La.1983). Defendant asserts his statement was not voluntary and was coerced by Det. Dietrich's comments to him regarding the state of his soul. Although not a part of the transcript of the statement because the recorder was off, Det. Dietrich testified at trial he "reminded [defendant] of hisuhsituation with his soul being weighed down and heavily burdened and that beforethat one day he would meet his God and wouldit would be improper for him to meet [H]im with such a heavy soul, burden and such. And we went on and I talked to him about, he needed to clear his conscience and speak to us about it and get it off his chesthis problems."
Statements by police to a defendant that he would be better off if he cooperated are not "promises or inducements designed to extract a confession." Lavalais, 95-0320 at p. 7, 685 So.2d at 1053. Additionally, a confession is not rendered inadmissible by the fact law enforcement officers exhort or adjure an accused to tell the truth provided the exhortation is not accompanied by an inducement in the nature of a threat or one which implies a promise of reward. The references by Det. Dietrich to defendant's soul and his suggestion defendant would feel better if he "got it off his chest" do not imply either a threat or a promise, and, defendant's decision to confess in light of these comments was his own.[11] In fact, defendant admitted he felt *32 better after confessing. Furthermore, the record does not support the allegation defendant's confession was anything other than a freely made decision to admit his crimes.
This assignment of error has no merit.
In a related assignment of error, defendant argues his due process rights were violated by Det. Dietrich's talking to him while the tape recorder was turned off. We are not aware of any due process requirement that a statement given to the police be recorded. Nor is there any support in the record for defendant's claim that the fact a portion of his statement was unrecorded somehow violated his due process rights or coerced him into giving a confession.
This assignment of error has no merit.

Gruesome Photographs/Supplemental Assignment of Error 7
With this assignment, defendant argues the trial court erred in allowing the State to admit numerous, gruesome photographs of the victims which had no probative value and prejudiced the appellant. Particularly, defendant asserts the gruesome nature and numerosity of the photos of both victims overwhelmed the jurors' reason and led them to convict and impose a death sentence without reasoned detachment. However, the State is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death and location and placement of wounds, and to provide positive identification of the victim. State v. Koon, 96-1208, p. 18 (La.5/20/97), 704 So.2d 756; State v. Maxie, 93-2158, p. 11, n. 8 (La.4/10/95), 653 So.2d 526, 532, n. 8. Photograph evidence is properly admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence, i.e. when the prejudicial effect of the photographs substantially outweighs their probative value. Koon, Id.; State v. Martin, 93-0285, p. 12-13 (La.10/17/94), 645 So.2d 190, 197-98, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).
A review of the exhibits reveals the State introduced 9 crime scene and 7 autopsy photos of Morris Prestenback and 7 crime scene and 4 autopsy photos of Kazuko Prestenback. Any excessiveness in the number of photographs introduced is solely a result of the numerosity and multiple locations of the wounds inflicted on Morris and Kazuko Prestenback. The State is entitled to use photographs to show the location and nature of all the victim's wounds. The autopsy photos were particularly necessary to show the numerous stab wounds on the victims. The photos of the location of Mr. Prestenback's body were relevant to convey to the jury how the attack occurred, especially in light of defendant's implication he did not attack Morris Prestenback while he was sleeping but in response to aggression by Prestenback. The photos of the location of Mrs. Prestenback's body, in her bed, were relevant to the State to show she posed no harm to defendant which would justify his attack on her, certainly a factor relevant in the penalty phase. Close-ups of the wounds to Morris Prestenback, who was stabbed and cut so many times in and about the face that the pathologist could not estimate the number, not to mention the numerous stabs to his chest area, were necessary for the State to prove the aggravating circumstance that the murder was committed in an especially heinous, atrocious, or cruel manner. The trial court did not err in introducing these photographs as their probative value outweighed any prejudicial effect they may have had on the jury.
This assignment lacks merit.

Guilt Phase Instructions/ Assignments of Error 17(A), (B), (C), (D), (E) & Supplemental 1
In these related assignments of error, defendant complains the trial court erred in its guilt phase instructions by failing to properly charge the jury.

*33 Assignments of Error 17(A), (D), (E) & Supplemental 1
In these assignments, defendant asserts the trial court erred in not properly charging the jury on the voluntariness of defendant's confession, circumstantial evidence, defense evidence, and the State's burden when there is a concession of guilt.[12] As discussed earlier, in Taylor this court held the "scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not." Taylor, 93-2201 at p. 7, 669 So.2d at 369. Defendant did not request a charge on the voluntariness of defendant's confession, circumstantial evidence, the defense evidence, or the State's burden when there is a concession of guilt, nor did defendant object to their omission. These assignments are therefore barred under Taylor.

Assignments of Error 17(B) & (C)
Defendant complains the trial court failed to instruct jurors on how to assess expert witnesses and police testimony properly. Defendant does not allege nor can we find any instance in the record where defendant either objected to the trial judge's instructions or requested additional instructions with respect to this issue. Consequently, this claim is barred under Taylor.

PENALTY PHASE

Prior Criminal Convictions/Assignment of Error 5
By this assignment of error, defendant asserts the trial court erred when it allowed the jury to learn of defendant's prior criminal convictions, without issuing a curative instruction, during the State's cross-examination of a defense expert in the penalty phase even though the defense had not introduced evidence of defendant's lack of good character or his criminal history. However, whether or not defendant has placed his character, or lack thereof, at issue in the penalty phase is irrelevant because a "defendant's character is at issue" in a Louisiana capital sentencing hearing. State v. Comeaux, 93-2729, p. 5 (La.7/1/97), 699 So.2d 16, 20 (emphasis in original)(quoting Sawyer, 422 So.2d at 104). In the penalty phase in its case-in-chief, the State introduced evidence only of defendant's 1988 guilty plea convictions for purse-snatching and unauthorized entry of an inhabited dwelling. Both of these incidents involved victims whom the State characterized as vulnerable because of their age or limited mental capacity. There had previously been proper notice and a hearing to determine admissibility for these crimes. The State introduced evidence of these crimes through court documents, victim testimony, and a probation officer's testimony.
During the defense's case-in-chief in the penalty phase, the defense called Dr. Gouvier who testified defendant was of limited intelligence, severely depressed and genuinely remorseful. During cross-examination of Dr. Gouvier by the State, the following exchange took place:
Q: Now, I want to talk about a person, you talked about him having problems about breaking the code; I want to talk about a person being street smart. Are you aware that the crimes for which he has been convicted, two prior felonies, this double murder, all involved elderly, what I would call, vulnerable victims? Are you aware of this?
A. I did not know that the car thefts involved elderly victims.
Q: I'm talking about a purse snatching, a form of robbery, involving a seventyyear-old female that was dragged *34 to the ground. You were not aware of this?
A. Ino the age of the victims, no.
(Emphasis added).
The "two prior felonies" mentioned by the prosecutor was clearly a reference to the 1988 guilty plea convictions for purse-snatching and unauthorized entry of an inhabited dwelling which had been previously properly admitted in the State's penalty phase case-inchief. The doctor responded, however: "I did not know that the car thefts involved elderly victims, no."
The State is not chargeable for a defense witness' unresponsive, blurted reply which alerts jurors to the fact defendant has other convictions. See, e.g., State v. Overton, 337 So.2d 1058, 1063 (La.1976). The defense did not object. More likely than not, had the court even issued a curative instruction, this would have drawn even more attention to the expert's statement regarding the other crimes. The record fails to show this brief reference by defendant's expert to other crimes not introduced at the penalty phase caused defendant any prejudice.

State v. Jackson/Assignment of Error 7
Defendant complains the trial court exceeded the parameters of State v. Jackson, 608 So.2d 949 (La.1992) when defendant's conviction for unauthorized entry of an inhabited dwelling was introduced at the penalty phase. During its case-in-chief, the State introduced testimony from the victim, Mrs. Vining, and a witness, her daughter, Jerri Vining. Defendant's argument is that Jackson authorizes testimony from a "victim or eyewitness," but not both. In Jackson, this court held the evidence supporting the conviction which could be introduced at the penalty phase was limited to the document certifying the fact of conviction and to the "testimony of the victim or of any eyewitness to the crime." Jackson, 608 So.2d at 954. Evidence a defendant has engaged in criminal behavior encompassing violence to the person, especially conduct involving the same or similar crime committed in a similar manner, is both relevant and probative on character and propensities. Such evidence generally does not inject an arbitrary factor into the proceedings because of its high probative value with respect to defendant's propensity to commit first degree murder. The incident at the Vining home falls within these parameters.
Jerri Vining, the victim's daughter, testified she knew defendant, "Boo" Robertson, from the neighborhood, and saw him walk through her house while she was sleeping on the couch. She testified she saw defendant walk into her mother's room and put a pillow over her mother's head. Jerri screamed and woke up her mother. Mrs. Vining testified she did not know anything about a pillow, but woke up to hear her daughter screaming "Boo, don't hurt my Mama." Defendant then left the home. The testimony of both witnesses was relevant and, indeed, necessary to paint a full picture of defendant's actions that night since Mrs. Vining was not awake at the time Jerri testified she saw defendant place a pillow over her head. Jackson should not be understood to preclude the introduction of significantly relevant evidence. The thrust of Jackson, instead, was to maintain the jury's focus on its function of deciding the appropriate penalty by eliminating marginally relevant evidence that does not aid the jury in performing this function. Any evidence significantly relevant to a defendant's character and propensities is generally admissible. In the instant case, allowing both Mrs. Vining and her daughter to testify briefly did not inject an arbitrary factor into the jury's deliberations.

Incompetent Witness/Assignment of Error 8
In a related assignment of error, defendant complains the court erred when it allowed an incompetent witness, Jerri Vining, to testify. Jerri Vining was 36 years old, lived at home, and had gone to school through the fourth grade. Her mother testified Jerri was not retarded, only slow.
Jerri Vining was able to recall, nearly ten years later, the occurrence of this crime and specific details. Defense counsel was not precluded in any way from cross-examining the witness as to her testimony or credibility nor did the defense object to Miss Vining's *35 competency to testify. Although the record shows Ms. Vining appears to be somewhat mentally deficient, this was a factor for the jury to consider in assessing the weight to be given to her testimony. Furthermore, the accounts of the episode by the mother and daughter are relatively seamless, and any variation might reasonably be attributed to the different perspectives of the women. There is no error here.

Polygraph Results/Supplemental Assignment 9
Defendant argues the trial court erred by denying defendant's motion to admit the testimony of a polygraphist at the penalty phase. Defendant asserts the polygraphist would testify the results of the polygraph test administered to Mr. Robertson show he was truthful in his confession concerning the events surrounding the offense. Specifically, defendant asserts the polygraphist was prepared to testify defendant answered truthfully when he said he was unarmed when he entered the house, that he was unarmed when he entered Mr. Prestenback's bedroom, that he was confronted by Mr. Prestenback who was armed with a knife, that he fought with Mr. Prestenback over this knife, and that Mr. Prestenback was ultimately stabbed with his own knife.
Defendant alleges this information is relevant: (1) to corroborate defendant's confession and show defendant was telling the truth when he confessed; (2) to show defendant did not enter the house with the purpose of committing an aggravated burglary and did not arm himself upon entry; (3) to present an accurate account of the circumstances of the offense and defendant's culpability, (specifically that he was confronted by Mr. Prestenback holding a knife); and (4) to test the State's theory of the case. Defendant's position is erroneous in several respects.
In State v. Catanese, 368 So.2d 975 (La. 1979), this court held it was the "judicial policy" in this state "to exclude polygraph evidence in criminal trials." Id. at 981. The results of a lie detector test are inadmissible in Louisiana when offered by either party, either as substantive evidence or as relating to the credibility of a party or witness. State v. Davis, 407 So.2d 702, 706 (La.1981); State v. Tonubbee, 420 So.2d 126, 132 (La.1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983). To admit such test results usurps the jury's prerogative on a question involving credibility. State v. Vinet, 352 So.2d 684, 690 (La.1977). The essential reasons to prohibit such evidence are the lack of probative value, insufficient scientific reliability, and the possible unduly prejudicial effect on lay triers of fact. Davis, 407 So.2d at 706. However, as we continued in Catanese. polygraph evidence may be admissible in "posttrial proceedings" "whenever the evidence is reliable and will aid in a decision." Such a decision would be "within [the] judicial discretion." Catanese, 368 So.2d at 982-983. In the instant case, defendant initially argues the penalty phase of a first degree murder trial constitutes a "post trial proceeding" under Catanese, and, thus, the polygraph results are admissible. However, defense counsel misunderstands our intent in Catanese.
In Catanese, this court gave the following explanation of its reasons for allowing for the admissibility of polygraph evidence in "post trial proceedings."
Although we conclude that polygraph evidence is inadmissible in criminal trials, the reasons for our decision do not prevent its introduction in post trial proceedings, within judicial discretion and subject to guidelines such as those laid down by the trial judge in the instant case. Because the defendant's guilt or innocence is not at issue in such proceedings, there is less demand for the rigorous guarantees of accuracy which typify the rules governing introduction of evidence at trial. Consequently, the reasons for excluding polygraph evidence in criminal trials are not necessarily compelling in post trial proceedings.
Catanese, 368 So.2d at 982-83 (emphasis added). This court mentioned a motion for a new trial as an example of this type of posttrial proceeding. Id. at 975. Consequently, in State v. Humphrey, 445 So.2d 1155 (La. 1984), we approved of a trial court's admission of polygraph evidence in a hearing on a *36 motion for new trial after a conviction for manslaughter. We described Catanese's holding as allowing for the introduction of such evidence in post-trial proceedings:
in order to assist the trial judge in his post-trial deliberations and to be considered along with whatever other evidence is presented in those proceedings ...
The introduction of polygraph examinations are allowed at the post-trial deliberations because the judge can properly assess and weigh the polygraph's validity and results with the other considerations and testimony presented in the post-trial proceedings.
Humphrey, 445 So.2d at 1159.
The above language indicates the penalty phase of a first degree murder trial, in which a jury of 12 men and women must assess and weigh the evidence in order to make a determination as to whether the defendant is sentenced to life in prison or to die by lethal injection, should not be considered a "post trial proceeding" in which polygraph evidence may be admissible. Indeed, echoing Catanese, unlike a motion for new trial ruled upon by a trial judge, there is a much greater demand in the penalty phase "for the rigorous guarantees of accuracy which typify the rules governing introduction of evidence at trial" because defendant's life is at stake and in the hands of twelve jurors. The reasons for Catanese`s proscription against the introduction of polygraph evidence in a criminal trialthe almost conclusive weight a trier of fact will give it, its questionable quality, and the lack of procedural rules governing its quality and introductionapply with even more force to the most important decision any criminal jury will have to make. Catanese and its progeny have held such polygraph evidence inadmissible because it usurps the jury's prerogative on a question involving credibility. Therefore, we hold the penalty phase of a first degree murder trial is not a post-trial proceeding contemplated by Catanese.
Even assuming we were to find it so, however, we find the trial judge did not abuse his discretion in denying defendant's motion. Although a defendant has a constitutional right to introduce virtually any evidence in mitigation at the penalty phase of a capital trial, the polygraphist's testimony sought to be introduced herein was irrelevant, had virtually no probative value, and would have been highly prejudicial. Defense counsel wanted to introduce the polygraphist's testimony to show defendant was truthful when he said he entered the home and Mr. Prestenback's room unarmed, that Mr. Prestenback confronted him with a knife, and that a struggle ensued. Only two statements were introduced into the record and heard by the jury in the instant case. One statement denied all culpability. The second statement was a confession to the crimes, and at no time therein did defendant claim he was unarmed when he entered the bedroom or that Mr. Prestenback confronted him holding a knife. Defendant did not take the stand in the trial and testify that, nor was any statement admitted in which defendant stated that, he was unarmed or that he was attacked by the victim with a knife. Thus, introducing any evidence regarding whether he was truthful as to these statements to the polygraphist is totally irrelevant to the jury's determination based on the evidence before it.
This assignment lacks merit.

Drug Rehabilitation Records/Assignment of Error 20
Defendant asserts the trial court allowed the State to introduce at the penalty phase defendant's records from drug rehabilitation clinics which had been improperly released to the State at an ex parte hearing without defendant's knowledge. On March 3, 1995, the trial court held a hearing with the State, without notice to or the presence of defendant, regarding the admission of defendant's rehabilitation records from the Baton Rouge Alcohol and Drug Center and the Baton Rouge Detoxification Center. The hearing was held as a result of the refusal of these two organizations to respond to the State's subpoena duces tecum requesting the records. As a result of the hearing, the records were released to the State and later introduced by it at the penalty phase of trial.
Under 42 C.F.R. § 2.65(a)(emphasis added), *37 An order authorizing the disclosure or use of patient records to criminally investigate or prosecute a patient may be applied for by the person holding the records or by any person conducting investigative or prosecutorial activities with respect to the enforcement of criminal laws. The application may be filed separately, as part of an application for a subpoena or other compulsory process, or in a pending criminal action.
Certainly, the "prosecution" of a first degree murder case includes the penalty phase wherein the character and propensities of the offender are at issue, and the sentence is determined. According to 42 C.F.R. § 2.65(d), a court may only order disclosure and use of these confidential records for the prosecution of a case if:
(1) The crime involved is extremely serious, such as one which causes or directly threatens loss of life or serious bodily injury including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, and child abuse and neglect.
(2) There is a reasonable likelihood that the records will disclose information of substantial value in the investigation or prosecution.
(3) Other ways of obtaining the information are not available or would not be effective.
(4) The potential injury to the patient, to the physician-patient relationship and to the ability of the program to provide services to tother patients is outweighed by the public interest and the need for the disclosure....
In the instant case, a double murder is patently an extremely serious crime, the records were more than likely to reveal information regarding defendant's drug addictiona pivotal part of defendant's defense at the penalty phase, there was no other way to obtain these records, and disclosure of the records would greatly further the public's interest in prosecuting, convicting, and properly sentencing criminals.
The regulation does not require notice to the criminal or that he be given an opportunity to be present or heard. Only the agency which received the application for disclosure of the records has these rights. There was no violation of the federal regulations governing record confidentiality.
Neither does the release of the records violate the health care provider-patient privilege of La. C.E. art. 510. Article 510(C)(2)(a) provides no provider-patient privilege exists when the communication is "relevant to an issue of the health condition of the accused in any proceeding in which the accused relies upon the condition as an element of his defense." In the usual criminal case, the provisions of Article 510(C)(2)(a) operate to ensure state access to health care diagnosis and treatment information relating to a condition or mental health issue urged by defendant in the nature of a defense to a conviction. We see no reason why a defendant's decision in the penalty phase of a first degree murder case to use the health condition of drug addiction as a defense to the State's efforts to persuade the jury to recommend the death penalty should be treated any differently. As such, La. C.E. art. 510 was clearly not violated by the release and introduction of these documents.
In a sub-argument, defendant additionally alleges his due process rights were violated because he was not notified of the State's intent to use this information at a sentencing hearing and was thus unable to properly prepare, citing Jackson, supra. In Jackson, this court held that with respect to unadjudicated criminal conduct, "[f]undamental fairness requires that when a prosecutor intends to use evidence of unrelated conduct to ... increase the punishment for the charged crime, the accused must be notified in order that he may prepare." 608 So.2d at 957. Without deciding whether Jackson even applies to require the State to notify defendant of its intent to introduce evidence related to defendant's drug use, or attendance at substance programs, we note defense counsel did not dispute the prosecutor's assertions at trial that she had turned over copies to him of everything released by the clinics, and, in fact, defense counsel conceded as much. Defendant therefore had actual notice of the documents and their contents, and there is no Jackson violation here.
*38 Finally, and most importantly, defendant cannot be heard to complain of the introduction of these documents since they mirrored precisely the kind of information the defense presented to convince jurors to spare defendant's life. After conceding factual guilt, the defense's strategy in the penalty phase was to focus on defendant's deprived and violent childhood, his few intellectual assets, his lack of opportunity to lift himself beyond his circumstances and his familial predisposition to addictive chemical substances. Any information contained in the rehabilitation centers' reports to this effect only served to duplicate the defense's own evidence.
This assignment lacks merit.

Right to Remain Silent/Assignment of Error 4
Defendant argues his due process rights were violated when the State referred to defendant as "uncooperative" during closing argument. Specifically, defendant argues the State used his invocation of the right to remain silent against him, in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). This argument is meritless. Doyle prohibits the State from impeaching an accused who testifies at the guilt phase of trial with his decision to remain silent after receiving Miranda warnings during the investigation of the crime. In this case, the State was not given an opportunity to impeach defendant because he did not testify at trial. Furthermore, defendant did not remain silent after his arrest and the Miranda warning, but spoke with the police, initially denied his culpability, and subsequently confessed to the crime. The State's reference to defendant as "uncooperative" because he initially denied responsibility for the murders therefore does not constitute an impeachment of defendant at trial with any invocation of his right to remain silent.
This argument lacks merit.

Lessening of Jury's Understanding of Responsibility/Supplemental Assignment of Error 8
Defendant argues the jury's understanding of its responsibility was improperly diminished when the trial court sustained State objections to the use of the word "kill" by defense counsel during penalty phase closing argument. Defense counsel had told the jury it had to decide "whether you're going to kill this kid" to which the State objected, and defense counsel withdrew the remark. He rephrased the issue as whether "you're going to vote for somebody else to do it" to which the State again objected, and defense counsel again rephrased as "if you vote to kill this kid." There were more objections, and, ultimately, the court cautioned defendant that it "would buy that [the lapse] was a mistake once," but "don't do it again."
In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the United States Supreme Court held that arguments which diminish a jury's sense of responsibility for the verdict and sentence, i.e. which imply the jury's verdict is not the final determination of whether defendant would be sentenced to death or not, inject an arbitrary factor into the proceedings and may result in reversible error. The typical comment in this area is a reference to appellate review of the jury's decision implying to the jury it is not "responsible" for the ramifications of its decision to impose the death penalty. See, e.g., State v. Scales, 93-2003, p. 12 (La.5/22/95), 655 So.2d 1326, 1335, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Jones, 474 So.2d 919, 930-32 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). The sentencing jury in a capital case must not be left with the "mistaken impression that the ultimate responsibility for determining the death sentence did not lie with them." State v. Lindsey, 543 So.2d 886, 903 (1989), cert. denied, 495 U.S. 966, 110 S.Ct. 2579, 109 L.Ed.2d 761 (1990).
There is no violation of Caldwell in the trial judge's decision to prohibit defense counsel from stating the jury would "kill this kid" if it voted for the death penalty. Certainly, it was reasonable, and within the judge's discretion, for him to require defendant to convey the importance and ramifications of the jury's decision in a less inflammatory manner. The jurors were repeatedly apprised of, and had no mistaken impressions *39 about, their duty as jurors. Panel members were properly instructed they bore the sole responsibility for deciding between life imprisonment or death by lethal injection. The State did not mention appellate review nor did it tell or encourage the jury to believe it was not responsible for the outcome. Rather, the State told the jury in its penalty phase closing argument and in its rebuttal argument that the sentence to be imposed was in the jury's hands, that the purpose of the jury was to return a penalty, death or life, and that this decision was the jury's alone. This assignment of error lacks merit.

Reference to Unadmitted Misdemeanors/ Assignment of Error 22
In this assignment, defendant argues the trial court erred in allowing the State to read a list of prior misdemeanor convictions to the jury in rebuttal argument, convictions which had not been admitted into evidence. The five adult misdemeanor convictions were unauthorized use of a moveable, theft of a bicycle, battery of defendant's sister, resisting a police officer, and attempted theft of clothing. Because Jackson, supra, limited evidence of unrelated convictions which the State may introduce in its penalty phase case-in-chief to felonies, the State did not seek to introduce these misdemeanor convictions during its case-in-chief in the penalty phase. Rather, the convictions came to light during cross-examination of Pete Gray and Kathleen Bregnac, witnesses called by defendant in his penalty phase case-inchief. These witnesses were called by the defense to counter State depictions of defendant as a career predator who sought out the weak, the elderly, and the vulnerable. They were questioned by defense counsel as to their personal opinions on defendant's character and about specific acts of defendant which would show his good character. Mr. Gray, an elderly man who knew defendant when he was younger, testified about defendant's years "as a kid" and stated that defendant was not mischievous or a troublemaker, was "very respectful to older people," did not engage in fights or violence, was not sassy, and was "always" a kid with whom Mr. Gray got along. Ms. Bregnac, the manager of the St. Vincent De Paul Store where defendant once did community service in 1988, was asked to testify about the kind of employee defendant was. Responding to specific questions, she testified defendant was "very dependable" and "very respectful" to the women at the store. When specifically asked about whether defendant had been "protective" of her and the other employees, she recounted an incident where defendant stepped between her and a "huge" man who had been cutting leather straps from handbags at the store. Another instance she testified about was when defendant alerted her to the fact that two youngsters were casing the store. During the cross-examination of these witnesses, the State examined both witnesses about all of defendant's convictions, including the misdemeanors which had not been admitted into evidence. This was an attempt to impeach the character witnesses' portrait of defendant by showing the witnesses did not have full knowledge of defendant's criminal history, some incidents of which even occurred during the time in which the witnesses observed and attested to his good character and acts.[13] Defense counsel did not object to their introduction nor to the State's use of the phrase "stealing a car" when explaining the unauthorized use of a moveable.
Later, during its rebuttal in the penalty phase closing argument, the State referred to defendant's extensive criminal record and, inter alia, listed the aforementioned misdemeanor convictions. Upon repeated objections by defendant as to the reading of the list and to describing the unauthorized use of a moveable conviction as one for "stealing a car," the trial judge sustained the objection and told the State it could not "simply ... read a list of convictions that have not been admitted." The defense did not ask for further *40 relief and did not object when the State later described defendant as having a significant criminal history because of his "convict[ions] of five separate misdemeanor crimes and ... two felony crimes" over a span of four years. No curative instruction was ever requested.
This court in Jackson never intended to shield from thorough cross-examination a defendant's attempts to impress upon a jury an inaccurate portrayal of his character and criminal propensities. In State v. Sepulvado, 93-2692, p. 14 (La.4/8/96), 672 So.2d 158, 167-68, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996), we noted Jackson indicated its limitations on admissibility of unrelated conduct in the penalty phase applied only to the State's case-in-chief, not to relevant rebuttal evidence. As this court has recognized, "neither law nor justice permits a defendant to foist a spurious reputation upon a jury because the State is so limited in its cross-examination of the character witnesses." Sepulvado, 93-2692 at p. 9-10, 672 So.2d at 165-66 (quoting State v. Banks, 307 So.2d 594, 599 (La.1975)). Certainly, here, the defense was attempting to paint a particular portrait of defendant with its questioning of the two character witnesses as to defendant's reputation in the community and as to specific behavior and conduct. The State was entitled to test their knowledge of his bad acts and to show to jurors their testimony as to defendant's good character and good acts rested on a less than adequate basis of knowledge. It is entirely proper, and not a violation of Jackson, to test a proponent of good reputation/character by inquiring if he or she is familiar with or has heard about particular acts, such as convictions, bearing upon the reputation at issue. Defendant opened the door to his misdemeanor record by the manner in which he questioned Mr. Gray and Ms. Bregnac. Thus, the State was entitled to rebut the general impression of "protectiveness" and "respectful" behavior toward women and the elderly which defendant had developed on direct examination and to question these witnesses to this effect on cross-examination.
Furthermore, regarding the prosecutor's reference to these crimes in her closing argument, we note defense objections in this regard were sustained by the trial judge, who ordered the State to refrain from mentioning the convictions in the rebuttal argument. If an objection is sustained, the defendant cannot on appeal complain of the alleged error unless at the trial level he had requested and had been denied either admonition to disregard or a mistrial. State v. Nicholas, 359 So.2d 965, 970 (La.1978). Defendant did not request an admonition or a mistrial. There is no merit in this assignment.
In a sub-argument, defendant argues the trial court erred when it allowed the State to mischaracterize one of these misdemeanors in the State's penalty phase rebuttal argument and did not provide the jury with a curative instruction. Specifically, defendant complains of the State's reference in its rebuttal argument in the penalty phase to defendant's conviction for unauthorized use of a moveable as a "form of car theft." We find no reversible error here. Jurors could not be expected to be familiar with the legal term "moveable," and a brief explanation was not improper. Furthermore, the prosecutor did not misstate the facts, for defendant's misdemeanor conviction for unauthorized use of a moveable, in fact, stemmed from the taking of a car. Additionally, as with defendant's complaint about the prosecutor's listing of the misdemeanors during argument, defendant's objections were sustained, and defendant cannot complain about the error on appeal since he did not request an admonition or a mistrial.

Proof of Underlying Felonies/Assignment of Error 16
Defendant complains of the trial court's failure to charge the jury at the penalty phase that, while he had conceded guilt for the crime of first degree murder, which necessarily includes the underlying felonies, the jury was still required to find at least one aggravating circumstance beyond a reasonable doubt at the penalty phase. Defendant did not object to the penalty phase instructions, nor did he request any special charges. This argument is similar to Assignments 15 and 18 discussed earlier in the "Voir Dire" *41 section of this opinion. As discussed thoroughly, supra, the jury was properly charged as to the State's burden of proof in the penalty phase as well as the requirement it must find the existence of an aggravating circumstance beyond a reasonable doubt before it could even consider imposing the death penalty.
Specifically, the panel was charged it must consider the existence of aggravating and mitigating factors before determining an appropriate punishment, and that before it considered whether to impose a sentence of death it had to first find at least one aggravating circumstance beyond a reasonable doubt. The court listed and defined the aggravating circumstances urged by the State. Jurors were charged that a failure to reach unanimity on an aggravating circumstance would result in defendant's being sentenced to life without benefit of parole, probation or suspension of sentence. If an aggravating circumstance was found beyond a reasonable doubt, jurors might consider imposing a sentence of death. That punishment was not automatic, however. Even if they found an aggravating circumstance beyond a reasonable doubt, jurors also must consider any mitigating circumstances before deciding on a penalty. The court read the statutory mitigating factors and charged panelists they might consider any other relevant circumstance in mitigation of punishment. If unanimity could not be reached on penalty, defendant would be sentenced to life without parole, probation or suspension of sentence.
Regarding the alleged prejudicial role defendant's "concession" played in the jury's decision to recommend death after the penalty phase, we note defense counsel, after the State rested its case-in-chief in the guilt phase, stated, "your honor, may it please the court, we have admitted our guilt. Defense rests." In the jury instructions during guilt phase, the trial court instructed the jury that "statements and arguments made by the attorneys are not evidence." Thus, any failure of the trial judge to instruct the jury in the penalty phase that defendant's concession does not alleviate the State of its burden of having to prove the existence of an aggravating circumstance is obviated not only by instructions actually given the jury during the penalty phase relative to its duties but also by the fact the jury had earlier been told to disregard any comments made by the attorneys. This assignment lacks merit.

Penalty Phase Instructions/Assignments of Error 17(F) & (G), & 24(A), (B), (C) & (D) & 23
In these assignments of error, defendant alleges the trial court committed errors in its penalty phase jury instructions.

Assignments 17(F) & (G)
By way of this assignment, defendant complains the trial court erred when it failed to instruct the jury on the statutory definition of "attempted perpetration" of the underlying aggravating felonies as charged by the State, and when it failed to provide the jury with a complete instruction on the elements of the underlying aggravating felonies which must be proven beyond a reasonable doubt. Although there was no charge on an "attempted" perpetration of aggravated burglary or armed robbery, and one was not requested by the defense, the error, if any, is harmless. The evidence in this case overwhelmingly showed that both crimes were fully completed and not merely attempted. Uncontroverted evidence adduced at the guilt phase, and introduced during the penalty phase, demonstrated defendant entered the victims' home, armed himself, stabbed the Prestenbacks to death, and left, taking a wallet, watch, keys and car. The facts establish, beyond any conceivable reasonable doubt, the commission of an aggravated burglary and an armed robbery. Therefore, the failure to charge on an "attempted" robbery or burglary did not prejudice defendant in any way or render the sentencing unreliable. Additionally, the trial court did, in fact, read the list of aggravating circumstances urged by the State to the jury and re-charged the jurors on the elements of aggravated burglary and armed robbery.
These assignments of error lack merit.

Assignments of Error 24(A), (B), (C) & (D), & 23
Defendant alleges the trial court erred in failing to draw a distinction for the jury between the killing of "more than one" *42 as an element at the guilt phase and as an aggravating circumstance at the penalty phase. Louisiana Code of Criminal Procedure Article 905.4(A)(4) provides that whether "[t]he offender knowingly created a risk of death or great bodily harm to more than one person" is an aggravating circumstance to be considered by the jury in the penalty phase of a first degree murder case. Revised Statute 14:30(A)(3), on the other hand, provides "[f]irst degree murder is the killing of a human being," inter alia, "[w]hen the offender has specific intent to kill or to inflict great bodily harm upon more than one person." Defendant asserts the jury should have been instructed during the penalty phase it was required to find he "specifically intended to kill more than one person" to constitute the "more than one" aggravating circumstance. It was not necessary for the court to instruct the jury it had to find defendant had the specific intent to kill more than one person, the definition of a first degree murder, in order to find the existence of the "more than one" aggravating circumstance. This court in State v. Johnson, 541 So.2d 818, 826 (La.1989), held that satisfying Art. 905.4(A)(4) "need not always be under circumstances where there is specific intent to kill or inflict bodily harm on more than one person," because Art. 905.4(A)(4) "encompasses a broader range of conduct than the first degree murder definition ... in La. R.S. 14:30(A)(3)." Additionally, defendant asserts the trial court should have instructed the jury that the aggravating circumstance exists only "when a single consecutive course of conduct by the offender contemplates and actually causes the death of one person and the death or great bodily harm of another." It was not necessary for the court to give this latter instruction, however, because it is simply a restatement of the aggravating circumstance that defendant knowingly created a risk of death or great bodily harm to more than one person.
This assignment of error lacks merit.
Defendant additionally alleges the court erred when it failed to instruct the jury on the definition of "heinous, atrocious, and cruel," in violation of Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Defendant did not request such an instruction or object to its omission. In Maynard, the Supreme Court reiterated that unchanneled juror discretion leading to unreliable capital sentencing decisions will not be tolerated. To insure against arbitrary and capricious outcomes in cases where the "heinous, atrocious, and cruel" aggravating circumstance is urged by the State, this court has narrowly construed the provision and upholds a jury's finding only upon proof of torture or pitiless infliction of unnecessary pain and suffering. State v. Brogdon, 457 So.2d 616, 629-30 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985); State v. Sonnier, 402 So.2d 650, 659, 660 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); State v. Tassin, 536 So.2d 402, 411 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (La.1989). While, ideally, the jury should be instructed on the proper narrow construction of this aggravating circumstance, Brogdon, 457 So.2d at 630, this court has held in State v. Hamilton, 92-1919, p. 15-16 (La.9/5/96), 681 So.2d 1217, 1227, cert. denied, ___ U.S. ____, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997), that the fact "the jury was unaware of the narrow construction to be given the `especially heinous' aggravating circumstance [does] not result in any prejudice to defendant's substantial rights or deprive him of a reliable sentencing determination," where there is "ample evidence of torture and pitiless infliction of pain and suffering." Without reiterating the previously explained injuries inflicted by defendant on Morris Prestenback, suffice it to say that Dr. Alfredo Suarez, the pathologist, testified that in 29 years as a pathologist, he had only seen one other stabbing as brutal, bloody, or violent as the instant crime.[14]
More importantly, however, where one aggravating circumstance is upheld on review, the failure of another aggravating circumstance will not invalidate the death penalty, unless it can be shown the evidence of the unproven circumstance injected an *43 arbitrary factor into the proceedings. Taylor, 93-2201 at p. 35-36, 669 So.2d at 382. As explained in this opinion, infra, the three remaining aggravating circumstances are more than amply supported by the record. It is therefore unnecessary for us to consider whether there was any error related to the trial judge's jury instruction on the "heinous, atrocious and cruel" circumstance.
In a related vein, defendant argues the court erred when it allowed the State to refer to the "heinous" nature of the crime during the penalty phase. As previously explained, there was no error in the trial court's failure to give a specific definition of "heinous, atrocious, and cruel." The State's references to the "heinous" nature of the crime in argument were proper. It had urged the circumstance with respect to Morris Prestenback's murder and had introduced medical evidence in support thereof. The State was entitled to allege and make the argument that the crime was heinous. This claim lacks merit.
Defendant additionally asserts the trial court erred when it failed to instruct the jury on intoxication of defendant as a mitigating circumstance when there was ample evidence of defendant's impairment at the time of the crime. This assignment lacks merit, however. The trial court charged the jury that impairment, as a result of a mental disease or defect or intoxication, of an offender's capacity to appreciate the criminality of his conduct or to conform to the requirements of the law at the commission of the crime was a mitigating factor. The trial court also instructed the jury it could consider mitigating circumstances other than those specifically enumerated by the court. The defense put on ample evidence of defendant's cocaine addiction. Defendant did not object to the charge given nor request an alternative charge. The jury was adequately informed of, and given the opportunity to, recommend life based on this mitigating circumstance but declined to do so.
Defendant further alleges the trial court erred when it did not re-advise or refer the jury back to its previous definition of "beyond a reasonable doubt" during its penalty phase instructions, thus leaving the jury with some confusion over what level of proof the State must show to justify the existence of an aggravating circumstance. The trial judge properly informed the jury during instructions in the penalty phase that "if you find beyond a reasonable doubt that an aggravating circumstance existed, you may consider imposing a sentence of death." The actual definition of "reasonable doubt" was given the jury during the guilt phase instructions.[15] During voir dire, each seated juror was extensively instructed and questioned regarding the concept of reasonable doubt and the burden the State would have to meet in both phases of trial. This assignment lacks merit.

Non-unanimous Verdict/Assignment of Error 25
Defendant argues a non-unanimous verdict was returned at the penalty phase because the verdict form read "the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary or an armed robbery." (Emphasis added). This court was presented with a similar argument in Williams, 490 So.2d at 262, where the verdict read that the murder occurred during an aggravated burglary "or" an attempted aggravated rape. This court rejected claims the jury had rendered a non-unanimous verdict, finding instead the jury had "intended to find the defendant guilty of both crimes." Id. In the instant case, the State urged the felonies as separate aggravating circumstances and not in the alternative or the disjunctive. The evidence fully supports a finding of both aggravating circumstances. The State established the commission of an aggravated burglary and an armed robbery beyond a reasonable doubt. The evidence *44 demonstrated defendant entered the Prestenback home without permission and with the intent to steal, and that after arming himself, he stabbed the couple to death. This constitutes an aggravated burglary. La. R.S. 14:60. Similarly he committed an armed robbery when, while armed with a butcher knife, he took a wallet, watch, keys and an automobile from Morris Prestenback's person or from an area within his immediate control. La. R.S. 14:64.
This assignment lacks merit.

CAPITAL SENTENCE REVIEW
Article I, Sec. 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. Louisiana Code Crim. Proc. art. 905.0 provides this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Defendant Allen Robertson, a black male, was 23 years old at the time of the commission of the murders. He came from an impoverished background, growing up in a notorious and violent section of Baton Rouge. Both his parents were alcoholics. He dropped out of school in the tenth grade. Although he is of very low intelligence, there was no evidence of psychosis or thoughtprocess disorder. He has not been married, but has several children, each by a different woman, whom he admits he does not financially support. He was an intravenous drug addict at the time of the crimes. Testimony revealed the longest defendant ever held a job was a month, and he was financially supported by his girlfriend and his mother who both received various forms of welfare.
Defendant's criminal history is lengthy. As a juvenile, he was convicted of felony theft and misdemeanor theft, and arrested but never adjudicated for unauthorized use of a movable, felony theft, misdemeanor theft (three times), being ungovernable, conspiracy to commit burglary and felony auto theft. As an adult, defendant pled guilty to pursesnatching and unauthorized entry of an inhabited dwelling. He was also convicted of unauthorized use of a moveable, theft of a bicycle, battery and resisting arrest, and attempted theft of clothing.

(a) Passion, Prejudice or any other Arbitrary Factors
Defendant argued a number of matters injected arbitrary factors into the proceedings. These claims were treated and disposed of under the individual assignments of error.

(b) Statutory Aggravating Circumstances
The jury returned all aggravating circumstances urged by the State. It found both murders were committed during the perpetration or attempted perpetration of an aggravated burglary or an armed robbery and that defendant knowingly created a risk of death or great bodily harm to more than one person. Additionally, the jury found the murder of Morris Prestenback had been committed in an "especially heinous" manner.
The State established beyond a reasonable doubt defendant knowingly created a risk of death or great bodily harm to more than one person. This aggravating circumstance exists when in a single consecutive course of conduct the offender contemplates and actually causes the death of one person and the death or great bodily harm to at least one other person. Roy, 95-0638 at p. 19, 681 So.2d at 1242.
The State also established the commission of an aggravated burglary and an armed robbery beyond a reasonable doubt. The evidence demonstrated defendant entered the Prestenback home without permission and with the intent to steal, and, after arming himself, stabbed the couple to death. *45 This constitutes an aggravated burglary. La. R.S. 14:60. Similarly, he committed an armed robbery when, while armed with a butcher knife, he took a wallet, watch, keys and an automobile from Morris Prestenback's person or from an area within his immediate control. La. R.S. 14:64.
Where one aggravating circumstance is upheld on review, the failure of another aggravating circumstance will not invalidate the death penalty, unless it can be shown the evidence of the unproven circumstance injected an arbitrary factor into the proceedings. Taylor, 93-2201 at p. 35-36, 669 So.2d at 382. It is unnecessary for us to consider whether the "heinous, atrocious and cruel" circumstance was sufficiently proven since no arbitrary factor was injected by this evidence, and since the three remaining aggravating circumstances are more than amply supported by the evidence.
In mitigation, the defense urged defendant's youth, and that at the time of the murders his capacity to appreciate the criminality of his conduct and to conform to the requirements of law was impaired by intoxication. Additionally, the defense urged the jury's consideration of the deprived and violent circumstances of his childhood, his few intellectual resources, and the virtual certainty he would become addicted to harmful substances.

(c) Proportionality to the Penalty Imposed in Similar Cases
Federal constitutional law does not require a proportionality review. Koon, 96-1208 at p. 19; citing Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup.Ct. Rule 28, 4(b) provides the district attorney shall file with this court a list of each first degree murder case tried after January 1, 1976, in the district in which the sentence was imposed. This court, however, has vacated only one capital sentence on grounds it was disproportionate to the circumstances of the offense and the character and propensities of the offender. State v. Sonnier, 380 So.2d 1 (La.1979).
In its Sentence Review, the State refers us to several cases arising in East Baton Rouge Parish where the death penalty was recommended for a defendant who committed a single murder in the course of an aggravated burglary or armed robbery, and/or in an especially heinous, atrocious and cruel manner, and/or under circumstances where defendant knowingly created a risk of death or great bodily harm to two or more persons. As none of the cases in the sentence review involve a double murder in the course of an aggravated burglary or armed robbery, the facts we are dealing with in this case, this court may judge the proportionality of a death sentence by reference to other capital prosecutions on a statewide basis. State v. Moore, 432 So.2d 209, 227 (La.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983). We find the following cases where the death penalty was imposed for a double murder occurring during an aggravated burglary or armed robbery of the victims' home most nearly resemble this one: State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wingo, 457 So.2d 1159 (La. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985), and Glass, supra, 455 So.2d 659 (La.1984).
Our review of the following cases shows the penalty in the instant case is not disproportionate. In Tart, supra, the victims were 70-year-old William Quenan and his 66-year-old wife, Lillian. They were murdered in their home and died as a result of multiple stabbing and cutting wounds. The defendant had strewn the contents of Mr. Quenan's wallet across the floor, rifled through the Quenan's jewelry, and fled in their van. Defendant was a 20-year-old male with an impoverished background who had quit school in the 7 th grade. Defendant had no criminal history other than a misdemeanor conviction for failing to appear. The jury found the murders were committed during the perpetration or attempted perpetration of aggravated burglary and armed robbery and that defendant knowingly created the risk of death or great bodily harm to more than one person.
In Burrell, supra, the victims were 65-year-old William Frost and his 56-year-old *46 invalid wife, Callie. They were murdered in their home by a single shot to the head from a .22 weapon. A suitcase known to contain their money was missing from their house after the murders. The jury found the killings were committed during the perpetration or attempted perpetration of an aggravated burglary and an armed robbery, and that the offender knowingly created a risk of death or great harm to more than one person.
Similarly, in Wingo and Glass, supra, the co-defendants had escaped from jail and gained entry to the home of Mr. and Mrs. Newt Brown, 55 and 53 years old. The victims were bound and then shot once in the back of the head. The defendants took money, guns, clothing, and an automobile. The jury returned the aggravating circumstances of a murder committed during an aggravated burglary, an aggravated escape, and an armed robbery, that the offenders knowingly created a risk of death to more than one person, and that the murders were "especially heinous." One defendant had a history of home burglaries, but no violent crimes. The other defendant had a juvenile history and convictions for marijuana possession and armed robbery.
Considering the foregoing, the death sentences for the crimes committed in this case do not appear disproportionate or surprising. Evidence at trial established the brutality and mindless viciousness of the murders committed in what the victims surely believed to be the safety of their home, "a particularly terrifying sort of crime to decent law-abiding people." State v. Wingo, 457 So.2d at 1170. Defendant stabbed his two elderly victims to death during the course of an armed robbery/aggravated burglary of their home. After having considered the above factors, we conclude the sentence of death in this case is not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as condition precedent to execution, as provided by La. R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
NOTES
[*] Johnson, J., not on the panel. See Rule IV, Part 2, Section 3.
[1] Under La. Const. Art. V, § 5(D)(2), convictions resulting in a sentence of death are to be appealed directly to this court.
[2] The defense conceded guilt. Defendant's attorney told jurors in his opening statement defendant had confessed and would have pled guilty to life imprisonment if allowed. At the conclusion of the prosecutor's case-in-chief, defense counsel stated, "we have admitted our guilt. Defense rests."
[3] This is illustrated by defense counsel's repeated questioning of jurors regarding the "form" the jurors filled out prior to voir dire in which the jurors had to give their estimate of the number of years a defendant sentenced to life in prison actually served.
[4] For example, in State v. Sawyer, 422 So.2d 95, 104 (La.1982), cert. granted, judgment vacated, remanded (on other grounds), 463 U.S. 1223, 103 S.Ct. 3567, 77 L.Ed.2d 1407 (1983), we observed:

We have never held ... that an automatic reversal of the death penalty must follow the mere mention of the fact that R.S. 14:30's prohibition against probation or parole for one under sentence of life imprisonment does not exclude executive pardon.
[5] The complained-of remarks came as the prosecutor was discussing premeditation and intent. (emphasis added).

I'll try to be pretty quick ... This is something that Judge Erwin mentioned very early, in explaining some of the law to you. And he mentioned about premeditation.... In Louisiana, we do not have premeditated murder. Now, you may, if you watch police shows, lawyer shows, you may have heard people say it was a case of premeditated murder. He had malice aforethought. We do not require, in Louisiana, that a crime be planned in advance. What we do require is that a person have what we call "specific intent". And basically, the judge will read you a definition of specific intent. But what it means, basically, is that a person intended the consequences of his actions, that he actively desired those consequences to follow. A simple way of saying it is, for example, if you pick up a loaded gun, point it at another human being, at their body, and you pull the trigger, you, as a jury, may be able to infer that in that case that person had specific intent to kill or inflict great bodily harm. Because when you do something like picking up a gun that you know is loaded, aiming it and pulling the trigger, that's a situation I think where you could understand that death or harm could result. Another example is take the Oklahoma case. If a person parks a truck that's loaded with explosives with a detonator on it next to a public building, in the middle of the day, knowing that that truck will explode, think you could presume that there is an intent to kill or inflict great bodily harm, in that set of circumstances. Mr. Blalock, could you follow that and can you accept that?
[6] Acts 1995, No. 1277, § 1, amended this portion of the article to read, instead: "In capital cases, after each juror is sworn he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered." This Act did not become effective until 8/15/95, some three months after this trial.
[7] Specifically, in Taylor, this court found no reversible error in the defense's agreement to the trial court's proposal to waive the requirement that individual jurors be sworn and sequestered as they are selected and instead to allow the individual jurors to return home pending the completion of the jury selection process at which time they would be sworn and sequestered together.
[8] In response to questioning from the bench, Ms. Lewis replied, "yes, definitely," when asked if she would always vote against the death penalty, explaining that "[you] shouldn't take someone else's life that haven's did you anything." She was "against the death penalty," and favored "shut[ting] up [a prisoner] for life, no parole, no come out, no nothing." "No," she told the court, she could not consider it and "wouldn't," under any circumstances, vote to impose it.
[9] Although it is unnecessary for us to determine whether the statements were, in fact, improper, we note that if the jury determined defendant committed either armed robbery and aggravated burglary in the guilt phase, it would only be reasonable to assume the same jury would necessarily find the elements of these crimes were met for purposes of determining whether these two aggravating circumstances exist in the penalty phase since the elements are the same in both phases of the trial.
[10] The warnings must inform the person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444, 86 S.Ct. at 1612.
[11] Defendant's reliance on Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) is misplaced. The issue in that case was whether police references to God and defendant's soul constituted further interrogation prohibited by Miranda after the invocation by defendant of his right to remain silent or to an attorney. That case does not stand for the proposition that these types of comments made where defendant has not invoked any Fifth Amendment rights render a resulting statement involuntary or coerced.
[12] Specifically, in Supplemental Assignment of Error 1, defendant contends the trial court erred in not charging jurors they had to determine if defendant's statement was voluntary and then decide what weight to give it, in not charging the jury that in order to find circumstantial evidence beyond a reasonable doubt, it must first find all underlying facts beyond a reasonable doubt, in failing to charge jurors defendant need not testify or present any evidence, by failing to give a "no adverse inference" charge immediately after defendant's opening remarks in which the jury learned defendant would not testify, and in failing to instruct the jury that it could not accept defendant's concession of factual guilt as a guilty plea, and that the State still had to prove guilt beyond a reasonable doubt.
[13] Although Mr. Gray had heard of the car theft, the purse snatching, and the entry into Ms. Vining's house, he was surprised to learn of defendant's convictions for battery on his sister, theft of a bike, resisting an officer, and attempting to steal clothes.

Ms. Bregnac testified she knew of the bike theft conviction but not of those for battery, resisting an officer, attempted theft of clothes, pursesnatching or burglary of Ms. Vining's home.
[14] Dr. Suarez testified the wounds to Morris Prestenback were "extremely painful," it took "a while for this to happen," and it was a "very brutal, bloody, violent, erratic, bizarre death."
[15] The judge informed the jury that "beyond a reasonable doubt" meant:

a doubt based on reason and common sense, and is present, when, after you have carefully considered all of the evidence, you cannot say that you are convinced of the truth of the charge. A reasonable doubt is nor a mere slight misgiving or a possible doubt. You may say it's self defining; it's a doubt that a reasonable person could entertain; it's a sensible doubt.